UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | NO. 3:25-CR-00005 |
| v. ) | |
| ) | JUDGE TRAUGER |
| ) | JUDGE FRENSLEY |
| JASON ALEXANDER JERKINS ) | |

UNITED STATES' MEMORANDUM IN SUPPORT OF
ITS MOTION FOR REVOCATION OF PRETRIAL RELEASE ORDER

The United States of America, by and through undersigned counsel, respectfully moves under § 3148 for the Court to revoke its Order Setting Conditions of Release (Doc. No. 11) granting the Defendant's pre-trial release on conditions. As explained below, the Government submits that there is probable cause to believe that, among other violations, the Defendant has committed a Federal, State, or local crime while on release, thereby triggering a rebuttable presumption of detention. The Government further submits that, even if the Defendant were to carry his burden of rebutting the presumption of detention, detention would still be warranted in this case, because he is unlikely to abide by the conditions of pretrial release.

**BACKGROUND**

*A. Underlying Criminal Charges and Conditions of Release*

Over approximately four and a half years between March 2020 and October 2024, the Defendant devised and implemented an embezzlement scheme against the clients who hired him to be their certified public accountant ("CPA"). But the Defendant did not stop at merely stealing from his clients' bank accounts, using the very banking information that they entrusted to him. Clients also hired the Defendant to handle their business and/or personal tax matters, and the Defendant neglected to prepare, file, and pay certain clients' tax returns and taxes due while also

1

preparing false personal tax returns which he filed for other clients. For many of these false returns, the Defendant directed the IRS to split the refund, directing the IRS to pay the true portion of the refund owed to the taxpayer-client by deposit into their bank account and to pay the false portion of the claimed refund to a bank account that he could control. Ultimately, during this period, the Defendant abused his trust as a CPA, stealing over $3.9 million from his clients' bank accounts and claiming false tax refunds to the IRS of approximately $380,000. The harm caused to his clients due to his failure to timely file and pay over their taxes due *as he was hired to do* has not yet been calculated.

For his efforts, the Defendant was handsomely and unjustly enriched. He used victims' funds to frequently travel, fund his alcohol addiction, purchase at least three additional residential properties, and invest in other of his and his then-wife's business ventures. Most of the victims of the Defendant's scheme have not been recompensated for the losses they suffered.

The Defendant founded his scheme on concealment and lies. To avoid detection, the Defendant used QuickBooks, a legitimate accounting software, to steal his clients' funds from their bank accounts. By using QuickBooks, when his clients checked their bank accounts, they saw transactions that appeared to be legitimate transactions by their CPA. What the clients did not know was that the Defendant was pocketing the money rather than using it to pay the business and tax expenses that they hired him to handle. Some clients grew suspicious of the Defendant and confronted him about the purpose of certain bank withdrawals. In response, the Defendant created false receipts showing a payment to a taxing authority that had instead gone into the Defendant's pocket.

But the Defendant could not be deterred. Even after clients confronted him, the Defendant continued operating his scheme. Even after IRS-Criminal Investigation special agents approached

2

him alerting him to their investigation of his scheme, the Defendant continued operating his scheme. Even after meeting with his defense counsel, IRS-CI special agents, and a federal prosecutor to discuss his scheme, the Defendant continued operating his scheme.

In January 2025, a federal grand jury returned the Indictment against the Defendant, charging him with wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1957), and preparing false tax returns (26 U.S.C. § 7206(2)). (Doc. No. 3.) Following the Defendant's arrest, the United States initially moved for detention but ultimately withdrew its motion after reaching a joint agreement regarding release conditions. Those release conditions were imposed on January 15, 2025. Like many defendants, the Defendant was subject to conditions including, among others, not violating federal, state, or local law while on release, advising his pretrial services officer of any moves or changes to his phone number, surrendering his passport, seeking employment, not possessing firearms, not using alcohol excessively, and not traveling outside the Middle District of Tennessee. But specific conditions were also crafted and imposed to prevent the Defendant from continuing his fraudulent ways while on release. (Doc. No. 11.) The Defendant was ordered that he was not to prepare tax returns for others, was not to initiate bank transfers in accounts belonging to others on which he is named, must delete and destroy all banking information for accounts on which he is not named, and not open new bank accounts. (Doc. No. 11.)

### B. *Defendant's Continuing Tax Preparation Activities*

Undeterred by client confrontation, meetings with federal agents and federal prosecutors, indictment, and arrest, the Defendant upon release continued his accounting practice and prepared tax returns for clients. But the Defendant did not continue preparing returns as normal. The Defendant, knowing that he was not permitted to prepare tax returns for others and that IRS

special agents were monitoring, removed his paid preparer information from the returns before filing the returns with the IRS. By not listing himself (or anyone) as the paid preparer, it thus appeared on the face of the return that the taxpayers had prepared the returns themselves.

As alleged in the Pre-Trial Services Petition, the Defendant prepared six tax returns for taxpayer-clients whom IRS special agents were able to interview and confirm that the Defendant did in fact prepare their returns. For three of these returns, the Defendant provided copies of the returns to his clients, and on that copy of the return, the Defendant listed his business, Jerkins Business Solutions, as the paid preparer. But before filing those returns with the IRS, the Defendant removed this information, concealing that he was continuing to file returns in violation of release conditions.

Moreover, one of these six returns was a false return. The taxpayer ("T.C.") confirmed for IRS agents that she had charitable contributions in 2024 of about $800, which she told the Defendant when he was preparing his return. T.C. further confirmed that she did not have charitable contributions in 2024 of $11,443, the amount the Defendant claimed on her tax return, and confirmed that she did not provide the Defendant with this number. Despite facing counts of filing false tax returns in the January 2025 Indictment, the Defendant, on release, filed yet another false tax return, violating both his conditions of release and 26 U.S.C. § 7206(2).

As part of his return preparation, the Defendant also obtained at least one client's bank account information (an account on which he is not a named account holder) and initiated payment for the client from her account to the IRS, violating yet another release condition. The Defendant also listed bank account information on over half of the tax returns that he filed while on release to direct the IRS to electronically deposit clients' refunds into their accounts, evincing further collection (or maintenance) of client bank account information.

While the Pre-Trial Service Petition alleges six confirmed tax returns filed by the Defendant on release—each return constituting a violation of his conditions, IRS special agents have identified approximately 130 additional 2024 tax returns prepared and filed by the Defendant since his release on conditions. Each of the taxpayers for these returns used the Defendant to prepare and file their 2023 tax returns, and their 2023 tax returns list the Defendant as their paid preparer. Like the confirmed returns, these 2024 returns do not list the Defendant or his business as the paid preparer on the return, but rather, they appear to be self-prepared. Agents have identified these returns as likely prepared by the Defendant due to factors including the IP addresses from which they were filed and/or the tax software used to file the returns. Special agents have not yet been able to investigate each of the 130 tax returns to confirm their veracity, that the Defendant was the preparer, or that the Defendant affirmatively removed his name from the paid preparer section of the return before filing with the IRS despite listing it on a client copy.

After the filing of the violation petition, IRS-CI agents interviewed the Defendant's ex-wife ("D.W."), whose 2024 tax return was also in the population of 2024 returns that agents identified as likely being prepared by the Defendant. D.W. confirmed to agents that the Defendant prepared her 2024 tax return. She also told agents that the Defendant paid child support to her using his business, Jerkins Business Solutions, classified the payments as payroll, issued her a Form W-2 for the payment (thus, reporting the payments to the IRS as wages, not child support), and reported these payments on her tax return as wages. Further, D.W. told agents that the Defendant used her businesses' bank accounts—on which the Defendant is not an account holder or signatory—without her authorization to pay his mortgage in March 2025 and to make two sales tax payments in April 2025 for his business, Tennessee Toddles.

5

## II. APPLICABLE LAW

"A person who has been released under section 3142 of this title, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). A court "*shall* enter an order of revocation and detention" if, after a hearing, it finds that two criteria are met. *Id.* § 3148(b) (emphasis added). The first criterion is that the Court find either (a) that there is probable cause to believe that the defendant has committed a Federal, State, or local crime while on release, or (b) that there is clear and convincing evidence of any other violation of the conditions of release. *Id.* § 3148(b)(1). The second criterion is that the Court find either (a) that there is no condition or combination of conditions of release that will assure that the defendant will not flee or pose a danger to the safety of any other person or the community, or (b) that the defendant is unlikely to abide by any condition or combination of conditions of release. *Id.* § 3148(b)(2).

Accordingly, at the revocation hearing, the Court should first determine whether there is probable cause to believe that the Defendant has committed a crime while on release. "To find probable cause, the evidence must 'warrant a man of reasonable caution in the belief' that the defendant has committed a crime while on bail.'" *United States v. Gentry*, 156 F.3d 1233, 1998 WL 47600, at *1 (6th Cir. 1998) (table of decisions) (quoting *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986)); *see also United States v. Hill*, 95 F.3d 1153, 1996 WL 466686, at *1 (6th Cir. 1996) (table of decisions); *United States v. Cantrell*, 848 F.2d 194, 1988 WL 50643, at *1 (6th Cir. 1988) (table of decisions). Probable cause "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (internal quotation marks and alterations omitted).

"If the Court finds probable cause that the defendant committed a crime while on release, 'a rebuttable presumption arises that no condition or combinations will assure that the person will not pose a danger to the safety of any other person or the community.'" *Hill*, 95 F.3d 1153, 1996 WL 466686, at *1 (quoting 18 U.S.C. § 3148(b)). This presumption of detention reflects a congressional judgment that "'the establishment of probable cause to believe that the defendant has committed a serious crime while on release constitutes compelling evidence that the defendant poses a danger to the community.'" *United States v. Jessup*, 757 F.2d 378, 381-82 (1st Cir. 1985) (Breyer, J.) (quoting Senate Judiciary Committee Report, S. Rep. No. 225, 98th Cong., 1st Sess. 19 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News, p. 36).

"Once the presumption is implicated, 'it is incumbent on the defendant to come forward with some evidence to rebut the presumption.'" *Hill*, 95 F.3d 1153, 1996 WL 466686, at *1 (quoting *United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989)). As such, the factors in § 3142(g) "do[] not come into play unless and until the judicial officer finds under § 3148(b)(2)(B) that the defendant has overcome the statutory rebuttable presumption and concludes that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions." *Cook*, 880 F.2d at 1162 (internal quotation marks and emphasis omitted). And while this burden "is not heavy," the defendant must introduce at least some evidence contrary to the presumed fact in order to rebut the presumption. *See United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (discussing analogous presumption under § 3142(e)(3) for defendants charged with certain specified crimes).

"[E]ven if the defendant comes forward with evidence to rebut the presumption, 'the presumption does not disappear, but remains a factor for consideration in the ultimate release or detention determination.'" *Gentry*, 156 F.3d 1233, 1998 WL 47600, at *1 (quoting *Cook*, 880 F.2d

7

at 1162). In making this ultimate determination, the Court should "look to § 3142 to determine if conditions of release are appropriate." *Hill*, 95 F.3d 1153, 1996 WL 466686, at *1. As such, the Court should consider (1) the nature and circumstances of the offense, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

### III. DISCUSSION

#### A. There is probable cause to believe the Defendant has committed crimes while on release.

The evidence presented at the hearing will establish probable cause that Defendant has committed crimes while on release. The Government anticipates that some of this evidence will be presented by way of hearsay or proffer, which is permissible in a hearing of this nature. *See Stone*, 608 F.3d at 948-49; 18 U.S.C. § 3142(f) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *see also United States v. Colasuonno*, 697 F.3d 164, 177 (2d Cir. 2012) (noting that "the full protections of the Confrontation Clause do not apply to preliminary hearings, bail proceedings, or sentencing" (citations omitted)); *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam) (holding that Confrontation Clause does not apply in bail hearings).

The Court should have no trouble finding that there is probable cause that the Defendant has continued committing at least two federal tax felonies while on release. As discussed above, the Defendant prepared a tax return for T.C., on which he claimed an over $11,000 charitable contribution deduction, despite the taxpayer-client's information to him that she only made about $800 of charitable contributions in 2024. This is a material falsity and is of the same nature as one of the alleged material falsities for the charged false tax return in Count Three of the Indictment.

8

*See United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008); (Doc. No. 3). To prove a violation of 26 U.S.C. § 7206(2), the government must prove that (1) the defendant aided, assisted, or caused the preparation and presentation of a tax return, (2) that the return was fraudulent or false as to a material matter, and (3) that the Defendant was willful. *Goosby*, 523 F.3d at 637.

Moreover, the Defendant prepared a tax return for D.W., his ex-wife, on which he reported the child support payments he made to her as wage income (and therefore taxable income) rather than as child support payments (which are not taxable). This is a material falsity. The Defendant also, despite a missing business tax return for JCDC, an s-corporation required to file a Form 1120S, reported income from JCDC on behalf of D.W. on her return. It is not clear whether the reported JCDC income for D.W. was true or false. D.W. told agents that the Defendant told her that he was allowed to prepare and file her tax returns (despite being prohibited from doing so by this Court) because they used to be married.

Nor should the Court struggle to find probable cause that the Defendant committed wire fraud while on release when he stole money from D.W.'s bank account to pay his mortgage and make two sales tax payments on behalf of his business, Tennessee Toddles. According to statements made by D.W. to agents, in January 2025, the Defendant asked her for help paying his mortgage that month. She agreed and authorized the Defendant to pay half of the Defendant's mortgage payment using her new JCDC bank account—which the Defendant did not have prior to January 2025. Following this payment, however, the Defendant exploited his access to D.W.'s bank account information. In March 2025, the Defendant paid his whole mortgage payment from D.W.'s JCDC bank account—a payment exceeding $4,000. After discovering his theft, D.W. confronted the Defendant, who did not repay the funds to D.W. D.W. told agents that she after the Defendant did not repay her the funds he stole, she complained to her bank, which credited her at

9

least part of the amount of the stolen funds. The following month, in April 2025, the Defendant continued his use of another of D.W.'s bank accounts—this time to make two sales tax payments for his business without D.W.'s authorization and for a business in which D.W. has no ownership. According to D.W., this bank account was for a business belonging to D.W. for which the Defendant, prior to his arrest, had helped with the taxes and bookkeeping, and thus the Defendant had previously had the bank account information. In total, the Defendant stole $1,210 through these two sales tax payments. According to D.W., she again confronted the Defendant about his theft, and the Defendant repaid these payments.

The standard for probable cause requires less of a showing than proof by a preponderance of the evidence. *See United States v. Ortiz*, 669 F.3d 439, 444-46 (4th Cir. 2012) ("Probable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'… And a standard requiring only a 'reasonable ground for belief of guilt' requires less of a showing than does the formal preponderance-of-the-evidence standard.") (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949), *Illinois v. Gates*, 462 U.S. 213, 235 (1983), and *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir.2004)); *see also Lucas v. Shively*, 31 F. Supp. 3d 800, 811 (W.D. Va. 2014) ("probable cause is a lower standard than "more likely than not," i.e., a preponderance of the evidence."); *United States v. Kerns*, 2016 WL 5745117, at *8 (S.D.W. Va. Sept. 30, 2016) (unpublished) ("Probable cause requires an officer to have a 'reasonable ground for belief of guilt,' a standard that is 'less demanding than a standard requiring a preponderance of the evidence for the belief.'") (citing *Ortiz*, 669 F.3d 439, 446). In this case, T.C. told agents that the Defendant prepared her return, provided agents with a copy of the return that includes the Defendant's business information in the paid preparer section (which was removed before it was filed), told agents that she had over $10,000 fewer in charitable

10

contributions in 2024 than is listed on her return, and told agents that she did not tell the Defendant the higher number to report on her return. And D.W. told agents that the Defendant prepared her return, reported his child support payments to her as wage income paid by Jerkins Business Solutions, reported this on her tax return knowing that these payments were not wages, and file her return. And D.W. also told agents about multiple unauthorized transactions that the Defendant caused out of her bank accounts to his benefit. Thus, there is more than enough probable cause to believe that the Defendant prepared a false tax return on behalf of both T.C. and D.W. and that he committed wire fraud when he used D.W.'s bank account to pay his mortgage and his business's sale taxes due.

### B. *Detention is warranted.*

The existence of probable cause triggers a presumption of detention, which the defendant has the burden to rebut. *See* 18 U.S.C. § 3148(b). At this point, it is unclear what evidence, if any, Defendant will come forward with, and whether such evidence will be sufficient to rebut the statutory presumption. But even assuming arguendo that he does rebut the presumption, detention is still warranted in this case. As noted above, detention is mandatory if, in addition to probable cause, the Court finds either that "there is no condition or combination of conditions of release that will assure that the defendant will not flee or pose a danger to the safety of any other person or the community," 18 U.S.C. § 3148(b)(2)(A), **or** that the Defendant "is unlikely to abide by any condition or combination of conditions of release," 18 U.S.C. § 3148(b)(2)(B). Both of those tests are met here.

First, if released, the Defendant will continue to pose a danger to those in the community who trust him with their financial and tax information not knowing that he is under indictment for financial and tax fraud charges. As identified above, there are seven confirmed tax returns that the

Defendant has filed while on release, at least an additional 130 tax returns that similarly appear to have been filed by the Defendant, and at least two of these returns have been confirmed to be false. It is unlikely that these 7 returns are the exception in the population of the over 130 tax returns identified as likely prepared by the Defendant in violation of his condition of release, and it is similarly unlikely that agents got lucky enough to select the only two false tax returns in their initial four interviews of taxpayers. Indeed, the reason that this condition was necessary to impose on the Defendant was because he has been charged with multiple counts of filing false tax returns and part of his embezzlement scheme was to charge clients for tax returns that he never filed. The danger that the Defendant poses to the community is the danger both that (1) the Defendant will file a false tax return—like those charged in Counts 3-7 of the Indictment and like those of T.C. and D.W. that he filed while release—for which IRS-CI special agents can only individually seek out taxpayers after the fact and for which, if a false return is filed, the taxpayer, rather than the Defendant, is subject to potential penalties and interest and repayment, and (2) that the Defendant will promise to file a tax return, collect payment, and then not file a tax return at all, for which IRS-CI special agents cannot track and it is incumbent on the taxpayer-client to report the Defendant's failure to file their return. For a defendant charged with filing false returns who has now violated his conditions of release by filing additional false returns, "the risk of the public's tax returns being done falsely is too great" for the Defendant to remain on conditions of release. *See United States v. Newell*, 22-5572, Doc. No. 17-2, at *3 (6th Cir. Nov. 16, 2022) (slip op.) (affirming nine and one-half month sentence of Defendant who violated supervised release conditions by filing false returns after conviction of tax fraud due to need to protect public through the next tax filing season). Indeed, as Tennessee's federal tax filing and payment deadlines were extended to November 3, 2025, due to April storms, the Defendant continues to pose a discrete

danger to the community by continuing to file false tax returns and possibly failing to file tax returns that clients hire him to prepare and file (but that agents have no ability to monitor). *See* IRS News Release: All of Tennessee qualifies for disaster tax relief, https://www.irs.gov/newsroom/irs-all-of-tennessee-qualifies-for-disaster-tax-relief-various-deadlines-postponed-to-nov-3 (last visited Apr. 28, 2025).

And beyond his false tax filings on behalf of taxpayers and the volume of tax returns that he has probably filed while on release and in violation of his release conditions, the Defendant also poses a danger by continuing to victimize those whose bank account information is known by him. According to D.W., she did not give the Defendant the information for at least one of her bank accounts from which he stole funds while on release, but instead would have known that information because he previously handled her business's taxes and accounting. And yet, one of his release conditions was to delete and destroy all bank account information in his possession for which he was not a named account holder. And while he certified to his counsel who certified such destruction and deletion to the Court, it appears that such certification was not true, calling into question what other access he has (or has since obtained) that he may use for further theft. And, based on the identified tax returns that appear to be filed by the Defendant on release, it appears that the Defendant has maintained or regained access to over 90 bank accounts.

Second, the Defendant is unlikely to abide by any condition or combination of conditions of release. The conduct at issue here is not a single, isolated event, but rather a pattern of illegal behavior that demonstrates a willingness to violate the law and cover it up. The defendant has repeatedly demonstrated that he is unable to abide by conditions of release.

The defendant violated the conditions of release in this case that he not commit any local, state, or federal law. After being released in this case, the Defendant continued being in the

13

business of preparing tax returns—a direct violation of his conditions of release—including by filing false returns as discussed above. As identified by agents, the Defendant likely prepared at least 130 tax returns while on release for former taxpayer-clients based on agents' comparison of 2023 and 2024 returns. This does not include returns for taxpayers who did not use the Defendant to prepare their 2023 returns nor taxpayers who believe they hired the Defendant to prepare their returns but whose return the Defendant did not file. Each of these 130 taxpayers are potential victims or witnesses for the charges in the indictment, contact with whom the Defendant was forbidden to have as part of his release conditions. On many of these returns, the Defendant obtained (or used maintained) bank account information to direct the taxpayer's refund to or from which to pay the taxpayer's tax due. Again, the Defendant was forbidden from maintaining bank account information as part of his release conditions to protect against the very theft that the Defendant is charged in Count One of the Indictment with committing and the theft that the Defendant committed against D.W. while on release. Further, the Defendant "ghost-prepared," that is, prepared returns that appear to be self-prepared by the named taxpayer, because he knew he was on release and prohibited from preparing and filing returns for others and to conceal his violations. And to placate questions from potential clients, the Defendant concealed the truth of his criminal conduct or lied about his ability to continue preparing and filing returns as part of his release conditions. Taken together, the Defendant's track record on release speaks for itself: no matter the conditions this Court imposes on him, he will violate the conditions of release. *See, e.g.*, *United States v. Sehgal*, 480 F. App'x 16, 20-21 (2d Cir. 2012) (noting that a "record of continuing criminal conduct and pervasive deceit cast doubt on the likelihood that [the defendant] would abide by the conditions of her release").

And the Defendant's pattern of behavior between learning of the investigation and his

arrest supports this conclusion. The Defendant was interviewed by federal agents in February 2024; met with his counsel, federal agents, and a federal prosecutor in July 2024; and provided documents to the prosecution team in October 2024. And despite knowing he was under investigation for the charged crimes, the Defendant continued his wire fraud scheme and continued stealing from victims. His charges by federal indictment, his arrest, and this Court's mercy to order his release on conditions did nothing to bring the Defendant into compliance. Instead, the Defendant continued his pattern of thumbing his nose at the criminal justice system and flagrantly violated the Court's conditions by which he agreed to abide pending trial. With this record, no conditions of release will assure this Defendant's compliance.

WHEREFORE, pursuant to Title 18, United States Code, Section 3148, the Government moves for the revocation of the Defendant's release pending sentencing.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney

*/s Mitchell T. Galloway*
MITCHELL T. GALLOWAY
Assistant United States Attorney
719 Church Street, Suite 3300
Nashville, Tennessee 37203
Telephone: (615) 736-5151